FILED

MAR 0 2 2020

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY_____DEP CLK

5:20-CT-3087

| | |
|---|---|
| Michael Cloud | ) |
| | ) |
|     Plaintiff/Petitioner | ) |
| | ) |
| | ) |
|     v. | ) |
| | ) |
| | ) |
| United States of America | ) |
| | ) |
|     PA Holly Harrell, FCI Williamsburg | ) |
|     PA Avery, FMC Butner | ) |
| | ) |
| | ) |

**Defendant's/Respondent's
Civil Suit For Damages
Complaint**

Comes now, Plaintiff/Petitioner Michael Cloud, Pro Se, who asks this Honorable Court to determine that the Defendants: (a) Negligently allowed the Plaintiff to continue daily activity without proper medical provisions (b) Failed to properly diagnose (c) Were negligent regarding Plaintiff's serious physical injuries (d) Engaged in medical malpractice relative to Plaintiff's injuries (f) Were deliberately indifferent to Plaintiff's injuries. Due to the negligence, malpractice, and deliberate indifference of Defendants, Plaintiff suffered physical injury, extreme pain, mental and emotional suffering and anguish, disfigurement, and multiple near, mid, and long term disabilities.

Plaintiff suffered a torn Achilles tendon at FCI Williamsburg in early 2015. Plaintiff was diagnosed and treated for inflammation with Cortisone injections and told to limit activity for a week. This provided very brief relief from the pain. Plaintiff repeatedly sought medical assistance from the Defendants for five

more months and was told nothing more could be done.

Plaintiff was transferred to LSCI Butner in October of 2016 where he continued to seek medical assistance. After several attempts at different physical therapy techniques, Defendant noticed a spike in pain. The affected area was swollen and mushy to the touch. This was brought to the attention of the therapist. She then stopped all therapy and Plaintiff was scheduled for an MRI on May 17, 2017 which confirmed the Achilles was totally severed. Plaintiff was then scheduled for a consultation with Dr. Hall, the Orthopedic Surgeon. There the doctor explained his plan to repair the tendon. He also explained that had Plaintiff been diagnosed properly with an MRI, doctors at Williamsburg FCI would have seen the tendon was partially torn and the simplest fix would be to stabilize the foot in a cast and the tendon would heal.

Corrective surgery was performed on June 1, 2017. Approximately 14 days later, Plaintiff was scheduled to have all sutures removed by PA Avery. Mr. Avery mistakenly left one suture in Plaintiff's leg. Plaintiff began physical therapy sessions three times a week and made progress. It was July 29 when Plaintiff noticed moisture along the incision. This was brought to the attention of the therapist and all therapy was stopped. A day or so later around August 4th, a meeting with Plaintiff, Dr. Hall, PA Avery and the physical therapist was called for staff to examine the incision, take a culture of the drainage and question Plaintiff about when he noticed the drainage was there, any pain, etc. Dr. Hall noticed the affected area was very red and Plaintiff advised him it was from sunburn and that he had gone outside over the previous weekend and removed his cam boot in hopes of pinpointing exactly where the drainage was coming from under the natural light. After swabbing the incision Dr. Hall reiterated the importance of wearing the cam boot at all times. Later that day, Plaintiff was called to Health Services by PA Avery who said he wanted to examine the incision closer.

Upon doing so PA Avery asked Plaintiff "Who took your sutures out? Did I do it?" and Plaintiff relied, "Yes. It was you." PA Avery stated "It looks like there is a stitch still in there." PA Avery then called a nurse to bring a suture removal kit and proceeded to remove the suture. On approximately August 6, 2017, Dr. Hall explained to the Plaintiff that just as he suspected due to the length of time between the surgery and the onset of the infection, it was definitely an outside-in infection meaning the bacteria found growing in the wound is one found in the intestine and most likely spread while bathing. On August 9th, Plaintiff underwent surgery number 2 to clean out any sign of infection and insert antibiotic beads. Plaintiff went through the same process after the second surgery as he did with the first with physical therapy three times a week but never made the progress he did after the first surgery. Plaintiff was also referred to the wound care speciality for a quarter sized hole in the incision that would not heal. Approximately early December 2017, the incision completely healed, and Plaintiff was released from the wound specialist. Plaintiff's physical therapy diminished over the next few months until it consisted of a list of exercises with a resistance band Plaintiff would do on his own. The physical therapist would keep track of his progress.

On April 6, 2018, Plaintiff was transferred back to LSCI Butner without any notification or any further rehabilitation. This is when the Plaintiff learned that he would never regain normal use of his right leg and when the claim actually accrued. As a result of the negligence, medical malpractice, and deliberate indifference of the defendants, Plaintiff suffered pain, anxiety, and disabilities. Plaintiff is entitled to compensatory and punitive damages.

## Jurisdiction

The Court has jurisdiction to hear this matter under <u>Bivins v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 38, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971); the Federal Tort Claims Act (FTCA) 28 U.S.C. §2671; 42 U.S.C. §1983; and the Eighth Amendment. To state a claim in a civil suit for damages, a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible'." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

## Pro Se

Pro Se complaints should be liberally construed and not held to the same standards as would be applied to a pleading prepared by a professional attorney. See <u>Estelle v. Gamble</u>, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1967); see also <u>Haines v. Kerner</u>, 404, U.S. 519 (1972). Plaintiff's complaint should be read with "special solicitude" and interpreted as raising the "strongest [claims] that they suggest." <u>Truiastman v. Federal Bureau of Prisons</u>, 470 F. 3d 471, 474-75 (2nd Cir. 2006) (per curiam).

## The Law

The Defendants are being sued under 42 U.S.C. §1983, <u>Bivins v. Bureau of Narcotics</u>, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), and the Federal Tort Claims Act (FTCA) 28 U.S.C. §2671. The FTCA grants the federal courts jurisdiction over:

> civil actions on claims against the United States for money damages... for injury... caused by the neglectful or wrongful act or omission of any employee of the Government while acting within the scope of his [or her] office or employment.
> 28 U.S.C. §1346(b)(1).

A claim under the FTCA must be filed within the two (2) years after such claim accrues. (See 28 U.S.C. §2401(b).) Plaintiff's claim accrued on April 6, 2018. Inmates can sue the United States under the FTCA for injuries sustained because of employee negligence. (See United States v. Muniz, 374 U.S. 150, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963) and United States v. Demko, 385 U.S. 149, 152-54, 87 S. Ct. 382, 17 L. Ed. 2d 258 (1966).) "The United States is the only proper defendant in a FTCA action." Oxedine v. Kaplan, 241 F. 3d 1272, 1275 (10th Cir, 2001). 42 U.S.C. §1983 states that:

> Every person who... causes to be subjected any citizen... or other person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and Laws, shall be liable to the party injured in an action at Law, suit in equity, or other proper proceeding for redress.

Bivins actions are available against individual officials. (See Correctional Services Corp. v. Lamako, 534 U.S. 61 70-72, 122 S. Ct. 515, 151 L. Ed. 2d 456 (2001).) Plaintiff has complied with the requirements of the Prison Litigation Reform Act (PLRA) and controlling case law by having exhausted his administrative remedies before initiating his Civil Suit for Damages. (Exhibit A)

The FTCA requires that the federal district court apply the substantive medical malpractice and negligence law of the state in which the claim arose – in this case the medical malpractice law of North Carolina. In North Carolina a Plaintiff asserting negligence must prove "the existence of a legal duty or standard of care owed to the Plaintiff by the Defendant, breach of that duty, and a casual relationship between the breach of duty and certain actual injury or loss sustained by the Plaintiff." Blackwell v. Hatley, 202 N.C. App. 208, 212, 688 S.E. 2d 742, 746 (2010); see Camalier v. Jeffries, 340 N.C. 699, 706, 460 S.E. 2d 133, 136 (1995). In addition, a Plaintiff alleging medical malpractice

must comply with North Carolina Rule of Civil Procedure 9(j). Rule 9(j) applies to medical malpractice claims and requires that a complaint alleging medical malpractice assert that an expert expected to testify at trial has reviewed all medical records and "is willing to testify that the medical care provided to the Plaintiff [fell below the] applicable standard of care."

## Rule 9(j)

Federal courts have recently held that medical malpractice and negligence civil suits that fail to include an "experts" statement should not be dismissed before the summary judgment stage, not at the "frivolity" or "Rule 12(b)(6)" motion to dismiss stage. This is so because federal procedural rules trump state procedural rules. Please see Gallivan v. United States, 19-a-0278 [DC No. 18-3874], (7th Cir. 11/07/2019) and Young v. United States, DC No. 18-3415 (6th Cir.)

### What was done wrong and not done at all.

1. At Williamsburg, an MRI should have been done; the staff would have seen the Achilles was partially torn.

2. Williamsburg should have implemented any one of several physical therapy techniques to try and strengthen the affected area.

3. When I spoke with Dr. Hall, the orthopedic surgeon at FMC Butner in North Carolina, he said the absolute worse thing to do with an injury like mine is to give the patient Cortisone injections because all it does is numb the pain. The patient can't feel the damage they are doing once they return to normal activity.

4. If Williamsburg medical staff had exhausted all avenues to their knowledge they should have sent me to a specialist for a proper diagnosis.

5.  At LSCI Butner when physical therapy had zero affect and I requested a MRI they should have given me one. Medical should not have waited until it was painfully obvious that my Achilles was totally severed before they ordered the MRI.

6.  At FMC Butner, PA Avery should have been more thorough while performing a medical procedure like removing sutures.

## The Facts

1.  While incarcerated at FCI Williamsburg in Salters SC, from March 2015 through October 2016, I began experiencing very intense sharp pain in my right Achilles.

2.  Around late 2015, early 2016 I began going to sick call. After several attempts to be seen, I was scheduled for an x-ray.

3.  Several weeks passed with no relief and no word from medical regarding the results of my x-ray. I went to sick call again where I was told I would be put on callout to discuss the x-ray results with my PA.

4.  Another week or so later, I was on medical callout for my PA. Mrs. Holly Herrell told me the x-ray showed bone spurs which caused inflammation and was the source of the pain.

5.  Mrs. Herrell told me I could either receive Cortisone injections which would relieve the inflammation and limit my activity for a week or so then resume activity as normal or refrain from any strenuous activity, manage the pain with meds bought from commissary, and monitor the situation.

6.  I chose to stop all activities pertaining to the legs to see if the situation would get better.

7.  Doing my best not to irritate the affected area, the situation continued to worsen rapidly. Out of options, I was forced to go back to sick call and request the Cortisone injection.

8.  Upon receiving the Cortizone injection, Mrs. Herrell instructed me no exercise for a week or so to allow for the best results possible.

9.  Everything went fine after the injection for maybe two months, then I began having the same pain in the right Achilles.

10. Upon going back to sick call, I was told by PA Herrell there was nothing more that could be done. The Cortisone injections could only be given every six months. I requested an MRI. I was told that was unnecessary, and I just needed to limit my activity.

11. Several months would pass in excruciating pain and limited mobility. Attempts were made to find relief. I was repeatedly told nothing else could be done. Eventually my custody level dropped, and I was transferred to LSCI Butner in Butner NC, in October 2016.

12. Upon arriving at LSCI Butner and receiving my initial health screening I was set an appointment with my new PA, Mrs. Atkins, I told her everything that had happened thus far regarding the pain in my leg. Soon after I was sent to physical therapy.

13. Physical therapy gave me resistance bands and a list of exercises to do to begin strengthening the area.

14. Several months went by with weekly therapy sessions producing zero positive results. I requested an MRI. Again I was told an MRI was not necessary.

15. Eventually, with my condition worsening rapidly and pain becoming unbearable, during one of our sessions Mrs. Rogers the therapist said we would try something different and applied a Tins unit to the area which is a type of electro-therapy.

16. Three or four weeks into the new therapy the pain got excruciating. It was difficult getting to meals and medical. There was a spike in pain. I noticed a lot of swelling. The area was red and gave off a lot of heat. Upon examination I felt the Achilles tendon. Starting at the heel moving up toward the affected area it felt mushy like there was no tendon there.

17. At my next therapy session I brought this to the attention of the therapist. She stopped all therapy.

18. I was scheduled for an MRI on May 17, 2017 that confirmed my Achilles tendon was totally severed. I was then scheduled for a consultation with Dr. Hall the orthopedic surgeon. He advised me of the condition of my Achilles, what had led up to the situation, and the steps necessary to correct it.

19. During this consultation Dr. Hall informed me that because I never had an injury specific to the Achilles it must have been degenerative meaning that the tissue broke down over time and the cause of the pain was the tendon slowly ripping, not inflammation.

20. Dr. Hall also explained the only way to diagnose this problem is through an MRI since soft tissue does not show up on x-ray.

21. Dr. Hall informed me that if diagnosed properly at an early stage with a case like mine with no trauma, treatment would be as simple as wearing a walking boot for a period of time. The tendon would heal itself.

22. Dr. Hall explained my options being that he wouldn't know the conditions of the tendon until surgery began and he could see the tendon. He advised me that in the perfect scenario the two ends of the tendon would be intact and could be sewn back together. He also said this was highly unlikely.

23. Dr. Hall also advised that due to the history of the injury, he suspected the two severed pieces of tendon would not be intact and therefore a piece

of tendon would be needed to splice the tendon together.

24. I had two choices regarding this part of the procedure. I could accept a donated tendon from a cadaver or use the tendon from the big toe on the same foot.

25. It was explained to me that even though I would lose some mobility in the big toe the body responds best to it's own tissue. I chose to proceed with the tendon transfer if necessary.

26. Surgery went well. I was allowed a few days to rest and heal. I met with Dr. Hall and he told me he did have to perform the transfer due to the condition of the tendon. I was then introduced to the physical therapy team at Butner.

27. Everything seemed to be going well. Physical therapy helped me start walking, first with a walker then crutches. Two weeks after surgery, I was scheduled to have all stitches removed by PA Avery.

28. I began seeing physical therapy three times a week doing very small movements that would increase over the coming weeks.

29. Roughly a month and a half after having the stitches removed the hard cast was removed, and I was given a walking boot with instructions to wear it anytime I was not in bed.

30. Meanwhile in physical therapy, I made a marked improvement gaining strength and range of motion.

31. A few weeks after being in the walking boot around July 29, 2017, I noticed a moisture along the incision at the surgical site. It was a Friday. I had been to physical therapy that morning and PT staff was gone for the weekend so I decided to monitor the situation until Monday.

32. In the summer months, the institution has sporting events outside so Saturday and Sunday I took the opportunity to find a spot to myself, remove the walking boot, and let my leg get some air and sun.

33. Monday morning I brought the moisture at the surgical site to the attention of the therapist. She examined the area and noticed it was very red. I informed her the redness was from sunburn.

34. A meeting was called with Dr. Hall, the physical therapy team, and myself where they examined the area, did a culture of the drainage, and questioned me about when I noticed the drainage, was there any pain, etc.

35. I believe it was later that same day. August 4, 2017, I was called to medical to see PA Avery. He wanted to examine the incision better. Upon doing so, PA Avery asked me, "Who took your stitches out? Did I do that?" I replied, "Yes, you did." Then he replied, "It looks like there is a stitch still in there."

36. Mr. Avery then called for a nurse to bring a suture removal kit and proceeded to remove the stitch previously left in my leg.

37. I believe it was August 6, 2017 I was seen by Dr. Hall. He was the surgeon who explained to me the culture taken from the drainage tested positive for a bacteria found in the intestine and confirmed the incision was infected.

38. Dr. Hall advised me he would prescribe a heavy dose of antibiotics and monitor the situation; however, after a few days Dr. Hall felt it was best to perform a second surgery that would eliminate the risk of compromising the repaired tendon, clean out any sign of infection, and insert slow release antibiotic beads.

39. That surgery went well. Again, I was allowed time to heal and rest before starting the same process with physical therapy as with the first surgery.

40. The difference after the second surgery from the first surgery was there was a spot in the incision about the size of a quarter that refused to heal. Staff tried for weeks to get the hole to close. Eventually I was referred to the wound specialist. It took several more weeks, but eventually the wound did heal around early December 2017.

41. The second issue after surgery number two was lack of progress despite hours of physical therapy. I never saw the gains that I did after the first surgery. I lost more mobility in the ankle, feeling from mid-calf to the heel, and never reached the milestones of strengthening the area as I did after the first surgery.

42. I feel that gross negligence and malpractice on the part of the BOP and it's staff caused me pain and suffering and left me with a host of problems that will most certainly burden me for the rest of my life.

43. The loss of function in the big toe due to the tendon transfer and stiffening of the joints involved has caused significant pain and balance issues.

44. The loss of mobility in the ankle is extremely painful. Going up stairs or any kind of incline and going down stairs is difficult because I have to step flat footed. If I try to support my weight on the toes of my right foot, I have excruciating pain in the arch and Achilles area.

45. The loss of mobility in the ankle combined with the lost function of the big toe creates serious instability. I have had several falls.

46. I have little jumping or push off power in the right calf. I have very low endurance for walking or standing for long periods of time which is bound to affect employment opportunities and quality of life.

47. I now require special made orthopedic shoes. More than an hour or so after wearing any other shoe results in days of excruciating pain in the arch and ankle.

## Relief Sought

Plaintiff's ruptured Achilles tendon, loss of function, and loss of range of motion and it's resulting injury resulted from the negligence of the defendants and their failure to provide adequate health care. Plaintiff experienced excruciating pain for not less than ten (10) months at FCI Williamsburg and not less than six (6) months at LSCI Butner before an MRI was performed in order to properly diagnose the Plaintiff. During this fourteen (14) months, Plaintiff's injuries went undiagnosed, untreated, and were exasperated and magnified during this period. Plaintiff had to undergo surgeries, immobilization, and physical therapy with all of the attending emotional duress and physical pain. Plaintiff faces life-long consequences stemming from the injury and delay in treatment such as heightened susceptibility to arthritis, loss of mobility, preclusion from exercise and sports, loss of income, expense of medical shoes and insoles, future medical procedures, etc. Defendant's failed to fulfill their duty of care to the Plaintiff. Defendants were medically negligent, engaged in medical malpractice and were deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff asks that he be awarded not less than two million, one hundred twenty thousand dollars ($2,120,000.00) in compensatory damages premised on:

1. Misdiagnoses and treatment of the wrong symptom that actually accelerated the deterioration of the Plaintiff's condition. $100,000.00

2. Fourteen (14) months thirty (30) days a month failure to diagnose and treat at $1,000.00 per day. $420,000.00

3. Fourteen (14) months thirty (30) days a month minus two (2) months less pain from Cortisone injection twelve (12) months extreme physical pain at $1,000.00 per day.     $360,000.00

4. Not less than six (6) months of physical therapy at $500.00 per day.     $ 90,000.00

5. Cost of future medical procedures.     $150,000.00

6. Compensation for life-long consequences including arthritis, loss of range of motion, preclusion from sports and exercise, limited future earnings, pain and suffering, and disfigurement.     $1,000,000.00

**Total: $ 2,120,000.00**

Respectfully Submitted,

Michael Cloud

Michael Cloud, Pro Se